Lake Shore & Michigan Southern Railway Company v. The National Live Stock Bank.

1. BILL OF LADING—*Form and Effect of*.—A transportation company which issues its bill of lading for property which it has received for transportation, is bound to the holder of the bill, who has advanced money upon it, to deliver the goods according to the terms of the bill.

2. SAME—*Terms Can Not be Disputed*.—A transportation company is in general not permitted to show that the statement of a reception of goods in a bill of lading is not true, but may be allowed to do so in cases where the agent of the company giving the bill has done so fraudulently or under a mistake of facts.

3. SAME—*Stoppage in Transit*.—For many purposes, when a bill of lading is issued, the title to the consignment vests in the consignee; but not so absolutely that he has, as against everybody, a right to retain the property without further action on his part. If the consignee becomes insolvent and the vendor is unpaid, he has a right of stoppage *in transitu* and such right is not lost by his having received conditional payment by bills of exchange, even though he may have negotiated them, provided they are outstanding in the hands of third parties unmatured.

4. STOPPAGE IN TRANSITU—*When the Right Ceases*.—A vendor of goods, not having received payment for the same, is entitled to have them stopped while in transit to the vendee, and this right may be exercised at any time until the transit is at an end.

5. SAME—*When the Transit Ends*.—The question in determining whether the transit is ended is, in what capacity is the property held by him who has the custody. If he is the vendee's agent to forward them to the intended destination at the time they are put in transit, the transit is at an end; but it is otherwise when they are in his possession for another purpose.

**Assumpsit.**—Breach of contract. Appeal from the Superior Court of Cook County: the Hon. JONAS HUTCHINSON, Judge, presiding. Heard in this court at the March term, 1895. Affirmed. Opinion filed at Chicago, July 5, 1895.

GARDNER & McFADON, PLINY B. SMITH and WINSTON & MEAGHER, attorneys for appellant, contended that a bill of lading, although signed by the agent of the carrier, when the goods have not been received by the carrier for shipment, does not bind the carrier. Grant v. Norway, 70 Eng. Com. Law 665 (10 Com. Bench Rep.); Hubbersty v. Ward, 8 Exch. 330; Brown v. Powell, Duffryn Co., L. R. 10 C. P. 562; Coleman v. Riches, 29 Eng. Law & Eq. 323; Friedlander v. Texas Railway Co., 130 U. S. 417; The Lady Franklin, 8 Wall. 325; Pollard v. Vinton, 105 U. S. 7; Schooner Freeman v. Buckingham, 18 How. 182; Railway Co. v. Knight, 122 U. S. 79; Robinson v. Memphis & Charleston R. R. Co., 9 Fed. Rep. 129; The Loon, 7 Blatch. 246; B. & O. R. R. v. Wilkens, 44 Md. 11; Fellows v. Steamer Powell, 16 L. A. 316; Lazard v. Merchants & Miners Tran. Co., 26 Atl. Rep. 897.

The recitals of a bill of lading may be explained, modified, and even absolutely contradicted by parol proof. Bissell v. Price, 16 Ill. 409; I. C. R. R. v. Cobb, 72 Ill. 148; Wallace v. Long, 8 Ill. App. 504; Lady Franklin, 8 Wall. 325; Sears v. Wingate, 3 Allen (Mass.) 103; Dean v. King, 22 Ohio St. 119; Strong v. Grand Trunk R. R., 15 Mich. 215; Hutchinson on Carriers, Sec. 122.

Actual delivery by a common carrier to the true owner of the property, the subject of affreightment, is a perfect defense to an action by the shipper of such property; in other words, a bailee may show the *jus tertii* to be in another, and a delivery to the true owner of the property, the subject of affreightment, is a good defense to an action by the bailor. The Idaho, 3 Otto (93 U. S.) 575; Western Trans. Co. v. Barber, 56 N. Y. 544; Mullins v. Chickering, 110 N. Y. 512; Railroad v. Wireman, 88 Pa. St. 265; Porter, Bills of Lading, Sec. 461.

PECKHAM & BROWN, attorneys for appellee, contended that a carrier who issues, through his agent, for that purpose, a bill of lading for goods which have been received, is bound to a holder named in such bill, who has in good faith advanced money on the strength of it, to deliver the goods

according to the terms of the bill.    Hutchinson on Carriers, Sec. 130; North Pa. R. R. Co. v. Commercial Nat. Bank, 123 U. S. 727.

A carrier of goods is estopped to contradict the bill of lading or shipping receipt issued by his agent for that purpose, as against a party named therein, who has in good faith advanced money in reliance on it.    Armour v. Michigan Central R. R. Co., 65 N. Y. 111; Northern Transportation Co. v. McCleary, 66 Ill. 236; St. Louis & Iron Mountain R. R. Co. v. Larned, 103 Ill. 293; Brooke v. N. Y., Lake Erie & Western R. R. Co., 108 Pa. St. 544, 546; Howard v. Tucker, 1 B. & Ad. 715; Coventry v. Great Eastern Ry. Co., 11 Q. B. Div. 776.

A consignor of goods who has an interest therein, has the right to change their destination while they are in transit; and it is the duty of the carrier to obey (if possible) his directions for that purpose.    Lewis v. Galena & Chicago Union R. R. Co., 40 Ill. 289; Blanchard v. Page, 8 Gray, 285; Diversey v. Kellogg, 44 Ill. 119; Union Stock Yards Nat'l Bank v. Gillespie, 137 U. S. 411.

Mr. Presiding Justice Waterman delivered the opinion of the Court.

In November, 1888, and for a number of years prior thereto, Hugh Gillice was a cattle buyer at the stock yards in Chicago.    Among those for whom he bought cattle was his brother, M. C. Gillice, of Albany, New York.

On the 8th day of November, 1888, Hugh Gillice bought 299 head of cattle for M. C. Gillice, or more correctly speaking, M. C. Gillice, through his brother, Hugh Gillice, bought 299 head of cattle.    For most of the cattle so purchased, Hugh Gillice gave to the vendors, scale tickets.    The scale tickets were substantially in the following form :

"National Live Stock Bank.    Pay account M. C. Gillice for —— cattle.

Hugh Gillice."

On the back of the scale tickets was indorsed the weight of the cattle and the price per pound at which they had been

sold. The custom of doing business in this regard was that sellers of the cattle deposited these scale tickets, so indorsed, with whatever bank the seller happened to be doing business, and the bank at the close of business on each day would collect all these scale tickets which had been paid or credited upon the pass-book of the customer by the bank during the day, attach the scale tickets to a draft drawn by the bank upon Michael C. Gillice, or whomever had purchased them, and forward the draft for collection from such person. Before paying any of the scale tickets presented to the bank of appellee on the 12th of November, 1888, for cattle purchased for Michael C. Gillice, the bank heard that Michael Gillice was in financial trouble, and at the close of that day's business the cashier of appellee found Mr. Hugh Gillice and went with him to the office of appellant at the Union Stock Yards for the purpose of getting a bill of lading.

At the office of appellant, Mr. Herrick, the cashier of appellee, met Mr. Vaughn, appellant's agent. Mr. Herrick said to Hugh Gillice, "If we pay for the cattle that you purchased for M. C. Gillice, we want either the guaranty of some bank East where he is doing business, or we must have a bill of lading. It is too late now, there is not time enough to get a guaranty, and I want a bill of lading for these cattle if you want them paid for." Whereupon, two bills of lading, being together for 299 head of cattle, were made by appellant and delivered to appellee; these bills of lading were in the customary form, acknowledging the receipt in good order from R. Z. Herrick, cashier, of 299 cattle to be forwarded as consigned in the margin; in the margin was, "Order R. Z. Herrick, cashier; notify M. C. Gillice, New York."

At the time these bills of lading were issued the cattle had been already loaded on the cars, and perhaps had then left the stock yards, consigned to M. C. Gillice.

Mr. Vaughn, the agent of appellant, who issued the bills of lading, testified that he did not hear Mr. Herrick say anything about requiring a bill of lading or a guaranty if the bank paid for the cattle, or anything to that effect; but that

Mr. Herrick came into appellant's office and wanted him, Vaughn, to change consignment of cattle from M. C. Gillice to read: " To the order of R. Z. Herrick, cashier. Notify M. C. Gillice, New York." Mr. Vaughn goes on: " I told him that the cattle had gone, and refused to change consignment until I had seen Hugh Gillice. Hugh Gillice was not present at the time. He was sent out for, and in a few minutes he came back with Hugh Gillice. Mr. Herrick wanted consignment changed and wanted a bill of lading, and Hugh Gillice says, ' I do not care a damn what you do, but you will be sorry for it.' That was the conversation that was had in my office."

Having obtained these bills of lading, appellant paid the scale tickets which had been presented to it, and also cashed a draft made by Hugh Gillice upon his brother, Michael Gillice, for certain cattle which Hugh Gillice, in purchasing for his brother Michael, had, instead of giving scale tickets, given his, Hugh's, personal check.

Appellant, instead of delivering the cattle to the order of appellee's cashier, in accordance with the terms of the bills of lading, delivered them to Michael C. Gillice, who turned out to be insolvent, and never paid the drafts made by appellee upon him; whereupon appellee brought suit and recovered in the court below $13,607.64, of which $10,443.79 was the principal sum paid by appellee for 230 cattle purchased and received by Michael C. Gillice, included in the bill of sale, which, with interest thereon from December 1, 1888, makes up the $13,607.64. Of the principal sum of $10,443.79, $1,075 was on account of money paid by appellee to Hugh Gillice to reimburse him for that sum which he had expended in the purchase of sixty bulls for his brother Michael Gillice, which sixty bulls were shipped at the same time as the other cattle and included in the bills of lading for 299 cattle.

Appellant says that the controlling feature in this case is, who was the owner of the cattle in question? As to this appellant urges that the cattle at the time these bills of lading were given to appellee were the property of Michael C.

Gillice, and therefore the statement in the bills of lading that appellant had received from appellee 299 head of cattle was untrue, and was known to appellee to be untrue at the time it received such bills of lading; that such being the case, appellant has a right to contradict said bills of lading, to show that the statement therein made is not true, and that it, therefore, delivered the cattle, as it properly might and ought, to the real owner thereof, Michael C. Gillice.

At the time these bills of lading were issued, Michael C. Gillice had not paid those from whom he purchased the cattle, otherwise than symbolically, if indeed the symbol was as to most of the cattle such that it can be considered in any sense a payment. While it is true that for many purposes it may be said that when these bills of lading were issued the title to the cattle was in Michael C. Gillice, yet it was not in him so absolutely that he had as against all the world a right to retain these cattle without further action upon his part. The vendors had received neither money for them nor commercial paper; they had merely that for which they expected to receive money. True, upon the reception of these scale tickets they had delivered the cattle to the agent of Michael Gillice, and had suffered such agent to put them on the cars for transportation to the East. Michael Gillice being, however, at the time insolvent, it would seem that the vendors had a right of stoppage *in transitu*. The rule laid down in Benjamin on Sales, Sec. 835, is that the vendor's right to stoppage *in transitu* is not lost by his having received conditional payment by bills of exchange or other securities, even though he may have negotiated the bills so that they are outstanding in third hands unmatured.

The vendors of these cattle not having received payment therefor were entitled to have stopped them in transit, unless the *transitus* of the cattle was at an end at the time these bills of lading were issued. As to this Benjamin on Sales, Sec. 846, says: "The question, and the sole question for determining whether the *transitus* is ended, is in what capacity the goods are held by him who has the custody;

is he the buyer's agent to forward them to the destination intended at the time the goods were put in transit."

It is clear from the testimony of both Michael Gillice and Hugh Gillice that the latter purchased these cattle for his brother for the express purpose of shipping them at once to him in New York, and not for the purpose of holding them for any time whatever, so that the entire travel of these cattle from the time they left the vendor's hands until they reached Michael Gillice in New York was one transit to the place of destination for transportation to which they were purchased.

That a transit is not ended merely because the goods come into the possession of an agent of the vendee, other than the transportation company is abundantly established by the cases of Stubbs v. Lund, 7 Mass. 453–456; Harris v. Pratt, 17 N. Y. 249–263; Harris v. Hart, 6 Duer, 606–619; Holbrook v. Vose, 6 Bosw. 76–103; Newhall v. Vargas, 13 Me. 93–109.

Moreover, the sale of these cattle was, it is manifest, a sale for cash. The vendors having delivered the cattle and not having actually received payment therefor, were entitled to bring suit at once against Michael Gillice, the purchaser. Being, as he was, a resident of the State of New York, they could have maintained an action of attachment against him and seized these very cattle, if they had not left the State, and garnisheed the appellant, in whose custody they were.

Whether the cattle at the time these bills of lading were issued were actually in the State of Illinois, does not with certainty appear. The only showing in respect to the place where they then were, is that they had been loaded upon the cars, and that the train had pulled out twenty-five minutes before. So that at the time these bills of lading were issued it is clear that Michael Gillice had not acquired such a possession of the cattle as that he could have held them against the action of the vendors, who had not been paid. Under these circumstances, his agent being applied to, at least does not refuse to consent to have the consignment of

the cattle changed and bills of lading for them issued to appellee; and while the emergency which would have required action on their part never occurred, it is altogether unlikely that had appellee refused to pay for these cattle the vendors of them would have allowed them to reach the actual possession of Michael Gillice without his paying for them.

It is to be presumed in this court that the finding of the trial court was upon all questions of fact, such that we would sustain its judgment, and consequently that appellant was informed before it issued these bills of lading, that unless appellee received them it would not pay for these cattle; yet we think if it was not distinctly so informed it would not be relieved from responsibility.

Appellant is chargeable with the knowledge which all great transportation companies have that moneys are paid and advances made on bills of lading in thousands of instances each day; that appellee for some purpose desired to and had obtained these bills of lading. Appellant could not, therefore, treat them as of no consequence; it knew that the cattle had already been placed upon the cars consigned to Michael Gillice, and that it had issued these bills of lading by which the cattle were to be delivered only upon the order of appellee.

There is no pretense that when these bills of lading were issued the cattle had actually been delivered to Michael Gillice, or were beyond the control of appellant. Being still in its custody, it could easily, by telegraph or mail, have informed its eastern agents of the bills of lading it had issued and the obligation it had entered into to deliver the cattle, only upon the order of appellee; not having done so, it has been justly held to respond to appellee for the loss sustained by its conduct in the premises.

Transportation companies have in many instances been allowed to show that the statement of a reception of goods made in a bill of lading was not true. In most cases this has been allowed, either because the agent of the company giving the receipt had done so fraudulently or did so under a mistake of facts.

In the present case Mr. Vaughn, the agent of appellant company, neither misunderstood the circumstances under which he, on behalf of appellant, issued these bills of lading, nor was he guilty of any fraudulent conduct. The most that is claimed by appellant is that he mistook his duty. Appellant's position in truth in this case is, that while Michael C. Gillice, not having paid for these cattle, had no right to hold them as against the claim of those from whom, without payment, he had obtained them, yet, appellant having received the cattle from his agent, was then bound to deliver them to him and thus aid and assist him to defraud his creditors out of what was their just due; and that, it having by way of so aiding issued bills of lading to appellee and thus induced appellee to pay for the cattle, but for which there is the highest probability that Michael C. Gillice would never have received these cattle, it is not now bound to reimburse appellee for the money it paid upon the faith of appellant's bill of lading, and in reliance upon the contract of shipment entered into by appellant with appellee.

We do not deem it necessary to consider the various propositions of law submitted to the trial court, as we are of the opinion that under the undisputed facts appellee is entitled to the judgment it obtained.

The judgment of the Superior Court is affirmed.